744 S.E.2d 178

Brian P. MENEZES, Petitioner,

v.

WL ROSS & COMPANY, LLC, Wilbur L. Ross, Jr., Michael J. Gibbons, David H. Storper, David L. Wax, Joseph L. Gorga, Stephen B. Duerk, WLR Recovery Fund II, L.P., WLR Recovery Fund III, L.P., WLR Recovery Associates II, LLC, and WLR Recovery Associates III, LLC, Respondents.

Appellate Case No. 2011–194626.

No. 27254.

Supreme Court of South Carolina.

Heard Feb. 6, 2013.

Decided May 22, 2013.

Rehearing Denied July 12, 2013.

524

William D. Herlong, of The Herlong Law Firm, LLC, of Greenville, Russell Thomas Burke, of Nexsen Pruet, LLC, of Columbia, and Thomas L. Stephenson and Andrew A. Mathias, both of Nexsen Pruet, LLC, of Greenville, all for Petitioner.

H. Sam Mabry, III, and Charles M. Sprinkle, both of Haynsworth Sinkler Boyd, PA, of Greenville, and Michael J. McConnell, N. Scott Fletcher, and Joseph E. Finley, all of Jones Day, of Atlanta, Georgia, for Respondents.

Chief Justice TOAL.

Brian P. Menezes (Petitioner) argues that the court of appeals erred in its analysis of when a claim for breach of fiduciary duty accrues under Delaware law. We disagree. The court of appeals performed a knowledgeable and perceptive analysis of the instant case. However, our review of Delaware law leads us to a different conclusion regarding the efficacy of Petitioner's claim. Thus, we affirm the court of

appeals' decision in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTUAL/PROCEDURAL HISTORY

Petitioner served as the chief financial officer (CFO) and interim chief executive officer (CEO) of Safety Components International, Incorporated (SCI), from 1999 until 2006. SCI was a publicly traded Delaware company with its headquarters and principal place of business located in Greenville, South Carolina. SCI designed and developed airbag fabric and airbag cushions. In 2005, SCI possessed a 66% share of the North American outsourced airbag cushion market, and an 11 % share of the total North American airbag cushion market, along with a 38% share of the European outsourced airbag cushion market, and a 16% share of the total European airbag cushion market. In June 2006, SCI terminated Petitioner. Petitioner sued SCI, alleging, *inter alia,* breach of contract and violation of the South Carolina Payment of Wages Act. In addition, a short time after his termination, Petitioner exercised his stock options and became an SCI shareholder.

Meanwhile, the SCI board of directors (the SCI Board) entered into merger negotiations with the former International Textile Group (FITG). WL Ross & Company, LLC (Respondents), controlled both SCI and FITG. Respondents include a New York investment firm, specializing in leveraged restructurings, leveraged buyouts, and industry consolidations of financially distressed companies. Respondents owned approximately 75.6% of SCI and held four of the five seats on the SCI Board. Respondents formed FITG in 2004 as a privately held Delaware corporation with its headquarters and principal place of business in Greensboro, North Carolina. FITG consisted of four principle lines of business: apparel fabrics, interior furnishings, government uniform fabrics, and specialty fabrics and services. Respondents owned 85.4% of FITG and held five of the six seats on the FITG board of directors (the FITG Board).

On August 29, 2006, the SCI Board approved the merger agreement between SCI and FITG. The SCI Board publicly announced the terms of the merger on August 30, 2006, with the filing of a Form 8–K with the Securities and Exchange

Commission (SEC). On September 1, 2006, the SCI Board filed a Joint Proxy Statement/Prospectus, also known as a Form S–4, with the SEC. The Form S–4 provided shareholders with details of the merger between SCI and FITG. The Form S–4 explained that shares of FITG common stock would be converted into the right to receive shares of SCI common stock at an exchange ratio of one share of SCI common stock for every 1.4739 shares of FITG common stock. The Form S–4 also explained that as a precondition of the merger, SCI would have to adopt an amended certificate of incorporation reflecting the newly merged company. However, this precondition was a mere formality, as shareholders owning 75.6% of the company, i.e. Respondents, indicated they intended to adopt such a certificate and re-elect their directors to the SCI Board. According to the Form S–4, completion of the merger did not require any further action by SCI shareholders, but FITG shareholders would have to approve the merger. However, Respondents owned 86.4% of FITG's stock and consented in writing to the merger at the time of the Form S–4's issuance. The Form S–4 also provided shareholders with information regarding the 2006 Annual Meeting where the merger would be formally finalized. It is clear from the Form S–4, that due to Respondent's ownership role in SCI and FITG, the planned procedures at the 2006 Annual Meeting were a formality.

The more intricate details of the merger are not pertinent to our analysis. However, Petitioner argues that Respondents breached their fiduciary duty to SCI's shareholders by approving merger terms which were unfair to SCI shareholders, failing to conduct due diligence regarding the financial condition of FITG, and failing to protect SCI's minority shareholders.[1]

---

1. Petitioner alleged that Respondents violated their fiduciary duties by:

 (a) proposing the [m]erger and then allowing it to close notwithstanding the financial condition of FITG;

 (b) approving the [m]erger on terms which gave 65% ownership to the FITG stockholders and diluted the minority shareholders to 35%, or at all [sic];

 (c) not providing accurate and complete information regarding FITG ... or ensuring that such information was provided;

On September 28, 2006, Petitioner and SCI resolved the termination suit and executed a Settlement Agreement and Release (the Release). The Release extinguished all of Petitioner's claims against SCI:

> As a material inducement to Employer to enter into this Confidential Settlement Agreement, [Petitioner] does hereby release, acquit and forever discharge ... from any and all manner of actions, causes of action, suits, claims, setoffs, debts, compensation, salary, benefits, sums of money, accounts, covenants, trespasses, damages, judgments and demands whatsoever, in law or in equity, whether known or unknown, liquidated, contingent, absolute, or otherwise, which [Petitioner] either has had or now has against [Respondents] for or related to any matter or things whatsoever from the beginning of time up to and including the date of execution hereof. It is [Petitioner's] intention to release all rights and claims that he may lawfully release.

The Release specifically barred Petitioner from bringing any claim as an owner of any stock or interest arising prior to the Release's execution and from pursuing any claims made, or that could have been made, in his employment lawsuit.

On October 20, 2006, SCI and FITG completed their merger, creating the new International Textile Group (NITG). On April 9, 2008, Petitioner sued Respondents alleging breach of fiduciary duties. Respondents asserted the affirmative de-

---

(d) failing to learn of the financial situation of FITG and failing to take it into account or see that it was taken into account with regard to the [m]erger;

(e) failing to ensure that proper due diligence was conducted on behalf of SCI or FITG;

(f) allowing the representation at the [m]erger closing that the [material adverse change] [c]lause condition was satisfied;

(g) failing to call off or renegotiate the [m]erger (or caus[ing] it to be called off or renegotiated) because of the financial condition of FITG;

(h) allowing the debt previously held by FITG to be transferred to Combined Company and/or by allowing that debt to be converted into preferred stock;

(i) allowing or causing the renegotiation [of] the SCI's credit facility and/or obtaining $100 million of additional preferred stock in connection therewith; and/or

(j) otherwise failing to protect the interests of the minority stockholders of SCI.

fense that the Release barred Petitioner's claim, moved for summary judgment, and asserted a counterclaim for breach of the Release. On July 31, 2008, the parties appeared before the trial court on this motion.

The parties agreed that this case presented a single issue of law: "[W]hen did the claims alleged in [Petitioner's] complaint accrue under Delaware law." Respondents asserted that, under Delaware law, a cause of action for breach of fiduciary duty accrues "when the wrong occurs," and in the merger context, this wrong occurs when a merger's terms are fixed. In this case, because Respondents controlled both SCI and FITG, the merger's terms were fixed when the SCI Board approved the merger. Under Respondents' view of Delaware law, the SCI Board fixed the merger terms prior to execution of the Release, thus barring Petitioner's claim.

Petitioner countered that the alleged wrong could not have occurred prior to when he could make a claim for damages. Accordingly, Petitioner argues that under Delaware law, a claim for breach of fiduciary duty cannot accrue until the merger is officially closed by vote of the company shareholders. Petitioner also focused on damages, and the general rule that a cause of action for the recovery of damages only accrues when the action can be prosecuted to a successful conclusion.

The trial court agreed that Petitioner's claims accrued no earlier than the closing of the merger. The trial court denied Respondents' motion for summary judgment, struck their affirmative defenses based on the Release, and dismissed Respondents' counterclaim for breach of the Release.

Respondents appealed and the court of appeals reversed. *Menezes v. WL Ross & Co. LLC*, 392 S.C. 584, 709 S.E.2d 114 (Ct.App.2011). The court of appeals noted the recent trend in Delaware law favoring the view that a claim for breach of fiduciary duty accrues as soon as the wrongful act occurs, and that whether or not a plaintiff can sue for damages is not dispositive because a plaintiff can seek injunctive relief. *Id.* at 593, 709 S.E.2d at 119 (citing with approval *Albert v. Alex Brown Mgmt. Servs. Inc.*, No. 762-N, 2005 WL 1594085, at *18 (Del.Ch.2005)). Thus, the court of appeals held the trial court erred by relying on case law distinguishable from the

latest Delaware decisions. *Id.* at 595, 709 S.E.2d at 120 ("After reviewing the facts *sub judice* and all the relevant case law, we conclude the circuit court's reliance ... was misplaced.").

Petitioner sought review from this Court, and we granted certiorari.

## ISSUE PRESENTED

Did the court of appeals err in reversing the circuit court's holding that Petitioner's claims accrued at the close of the merger?

## STANDARD OF REVIEW

The question of when a cause of action arises or accrues is a question of law. *Stephens v. Draffin,* 327 S.C. 1, 5, 488 S.E.2d 307, 309 (1997); *Brown v. Finger,* 240 S.C. 102, 111–12, 124 S.E.2d 781, 785–86 (1962). This Court undertakes a de novo review of all issues of law, and is free to decide matters of law with no particular deference to the trial court. *Fields v. J. Haynes Waters Builders, Inc.,* 376 S.C. 545, 564, 658 S.E.2d 80, 90 (2008).[2]

## LAW/ANALYSIS

### I. Fiduciary Duty Defined

Resolution of Petitioner's claim requires a brief description of Delaware law regarding the fiduciary duties of corporate directors and officers.

Under Delaware law, the duties of a fiduciary are composed of three elements: care, loyalty, and good faith. Hillary Sale, *Enron and the Future of U.S. Corporate Law and Policy,* 89

---

2. Delaware law controls the question of the accrual date as claims concerning the fiduciary duties of corporate officers are governed by the state of incorporation. *Menezes,* 392 S.C. at 589–90, 709 S.E.2d at 117 (relying on Restatement (First) of Conflicts of Laws § 187 (1934)). "Generally, the rights and obligations of stockholders, including the relative rights of stockholders as respects the corporation itself, are determined and controlled by the law of the state of incorporation." *Id.* at 590, 709 S.E.2d at 117 (quoting 18 Am.Jur.2d *Corporations* § 21). South Carolina courts generally follow the traditional choice of law rules as stated in the Restatement of Conflicts of Laws. *Id.* (citing *McDaniel v. McDaniel,* 243 S.C. 286, 292, 133 S.E.2d 809, 813 (1963)).

Cornell L. Rev. 456, 463 (2004). Directors and officers who comply with the duty of care are more likely to weigh decisions, consult with appropriate advisors, and disclose conflicts of interest. *Id.* at 465. Courts monitor the duty of care through the business judgment rule, which delegates the business affairs of Delaware corporations to the board of directors. *Id.* "The business judgment rule presumes that in making decisions and managing the corporation, fiduciaries have acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Id.* (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). In *Smith v. Van Gorkom,* 488 A.2d 858, 893 (Del.1985),[3] the Delaware Supreme Court held that corporate directors cannot create a "safe harbor" for their decisions by simply securing shareholder approval. *Id.*

▮▮ The duty of loyalty requires corporate officers and directors act in the best interest of the corporation and prioritize the corporation's interest above their own. *Id.* at 483. The traditional formulation of the duty of loyalty states that if corporate directors and officers are independent of, and disinterested in, the complained of transaction, the court will not find them liable for a breach of that duty, unless the facts of the transaction are "such that no person could possibly authorize it if he or she were attempting in good faith to meet their duty." *Id.* at 484–85 (citing *Gagliardi v. TriFoods Int'l Inc.,* 683 A.2d 1049, 1053 (Del.Ch.1996)).

▮ Finally, corporate directors and officers acting in good faith abide by the norms of corporate governance and comply with legal standards while performing their jobs. *Id.* at 485. Egregious or conspicuous failures to do so are subject to liability under the duty of good faith. *Id.* For example, directors must ensure that complaints about the company are sufficiently investigated. *Id.* Officers must create appropriate systems within the company to ensure proper governance, and material decisions must be supported by all reasonably avail-

---

**3.** *Overruled on other grounds by Gantler v. Stephens,* 965 A.2d 695, 713 n. 54 (Del.2009) (articulating the proper scope of the shareholder ratification doctrine); *see also Emerald Partners v. Berlin,* 787 A.2d 85, 90 (Del.2001) (recognizing that part of *Van Gorkom's* holding has been superseded by statute).

able facts. *Id.; see also* Robert Summers, *The General Duty of Good Faith—It's Recognition and Conceptualization*, 67 Cornell L. Rev. 810, 811 (1982) ("[A]lthough the general duty of good faith and fair dealing is no more than a minimal requirement (rather than a high ideal), its relevance ... is peculiarly wide-ranging, and it rules out many varieties of bad faith in a diverse array of contexts.").

In our view, Delaware courts focus on the possible injury created by corporate directors' failure to adhere to their duties, apart and aside from any *after the fact* ratification or approval by corporate shareholders.

In his brief before this Court, Petitioner states unequivocally that "under Delaware law, a claim for breach of fiduciary duty against the directors or officers of a corporation sounds in tort." Petitioner is incorrect.

A recent commentary, upon which Petitioner relies, discussed this point:

> After a brief flirtation with the earlier theories that breaches of fiduciary duty arose in contract, a strong majority view emerged that characterized breaches of fiduciary duty as tort claims. For example, in the part of the country that was ground zero for the savings and loan crisis, courts consistently held that claims for breach of fiduciary duty against corporate fiduciaries were tort claims.

J. Travis Laster, Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71, 92–93 (2010). However, Petitioner failed to include in his brief the article's subsequent paragraph. That paragraph is critical to understanding the article's intended point:

> As a result of these authorities, there is now a large body of case law *outside of Delaware that treats a claim for breach of fiduciary duty against corporate directors as a tort.* These decisions do not make fine distinctions between "legal" or "equitable" torts, nor do they delve into the nuances of the equitable underpinnings of the relationship. They simply hold that a breach of fiduciary duty is a tort. The natural consequence of such an approach is that contribution under the Uniform Act would exist, unless a state has adopted the provision from the 1955 revision excluding

breaches of fiduciary duty from its coverage. ***Delaware's approach to fiduciary duties, however, is not so simple.*** *Id.* at 93 (emphasis added). The Delaware Supreme Court's decision in *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345 (Del.1993), assists in understanding the reasoning behind the Delaware courts' position.

The *Technicolor* chronicle spans twenty years of litigation and six remands by the Delaware Supreme Court. Laster, 11 Del. L. Rev. at 94 n.130. The pertinent issue flows from an appraisal proceeding brought by Cinerama, Incorporated (Cinerama) following the acquisition of Technicolor, Incorporated (Technicolor). *See Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1184 (Del.1988) (analyzing an interlocutory appeal regarding, *inter alia,* a shareholder's right to maintain an action for fraud in connection with the merger as well as appraisal action). Cinerama developed evidence that it believed supported a claim that the Technicolor directors breached their duties of loyalty and care, and filed an action asserting this claim. *Id.* The trial court first ruled on the terms of the appraisal,[4] and then issued a separate opinion addressing the fiduciary duty claim. The trial court held that even if the directors failed to exercise due care, the plaintiffs bore the burden to establish causation and damages. *Cinerama, Inc. v. Technicolor, Inc.*, Civ. A. No. 8358, 1991 WL 111134, at *3–4 (Del.Ch. June 24, 1991) ("But I am of the view that the questions of due care ... need not be addressed in this case, because even if a lapse of care is assumed, plaintiff is not entitled to a judgment on this record. That is because in this situation, where there is no self-dealing or other breach of loyalty, it is plaintiff's burden to establish by evidence that it was injured as a result of the board's action. This it has not done.").

Cinerama appealed, and the Delaware Supreme Court reversed. *Technicolor*, 634 A.2d at 370. The court held that tort principles did not control a claim for breach of fiduciary duty, and that these principles "have no place in a business judgment rule standard of review analysis." *Id.* at 370. The Delaware Supreme Court's decision in *Technicolor* represents

---

4. *See Cede Co. v. Technicolor Inc.*, Civ. A. No. 7129, 1990 WL 161084, at *1 (Del.Ch. Oct. 19, 1990).

the last *significant* discussion among Delaware courts regarding the proper characterization of breach of fiduciary duty claims. Laster, 11 Del. L. Rev. at 96. However, later cases follow *Technicolor* in treating a breach of fiduciary duty claim as distinct from common law tort or contract claims. *Id.* (citing *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 n. 43 (Del.2007); *IM2 Merch. and Mfg., Inc. v. Tirex Corp.*, No. CIV.A.18077, 2000 WL 1664168, at *6 (Del.Ch. Nov. 2, 2000) ("Plaintiffs' claim is really one based on contract or tort law, rather than the law of fiduciary duty.")).

■ The Delaware Supreme Court's decision in *Technicolor* surprised commentators previously under the assumption that a breach of fiduciary duty was a tort, especially in light of the majority of jurisdictions outside of Delaware that classify the breach in this way. *Id.* at 97–98. However, it is clear that while a breach of fiduciary duty may "look, swim, or quack like a tort," under Delaware law, it is not. *See id.* at 98 (citing *McMillan v. Intercargo Corp.*, 768 A.2d 492, 506 n. 62 (Del.Ch. 2000) (using the "duck" analogy in determining which contractual merger provisions with defensive impacts would be reviewed as defensive measures)); *see also Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 820 (1944) (holding that where corporate officers and directors are required to answer for enriching themselves through injury to the corporation, the court would "not regard such acts as mere torts, but as serious breaches of trust").

The foregoing authority provides clarity on two points important to the resolution of the instant case. First, Delaware courts generally focus on the corporate directors' actual breach of fiduciary duty, as an injury, regardless of whether that breach causes separate damage. Second, Delaware courts do not consider a breach of fiduciary duty a mere tort, but instead as its own distinct cause of action. This perspective comports with the very existence of Delaware's deferential business judgment rule, and robust business court regime. Treating malfeasance by corporate directors and officers as torts would represent a significant incongruity with the rationale behind Delaware's Chancery Court system.[5]

---

5. The Delaware Chancery Court is widely recognized as the nation's preeminent forum for the determination of disputes involving the inter-

## II. The Claim Accrual Narrative

The parties have constructed a battle royale between what appears to be two competing lines of cases explaining when a claim for breach of fiduciary duty accrues under Delaware law. However, these competing cases are best viewed as two subsets representing different eras in a continuing narrative of the Delaware court's evolution on claim accrual in the fiduciary duty context. The Delaware Supreme Court's controversial decision in *Van Gorkom* stands as a dividing line between that subset of cases holding that a claim for breach of fiduciary duty accrues only after a party is injured in the form of actual damages, and the later subset that view the breach itself as sufficient injury to support a claim. Thus, we analyze the authority pertinent to the instant case in three sections: pre-*Van Gorkom* authority,[6] the *Van Gorkom* decision, and post-*Van Gorkom* authority.[7]

### A. Pre-*Van Gorkom*

In *Kaufman v. Albin*, 447 A.2d 761 (Del.Ch.1982), Turner & Newell Industries, Incorporated (Turner), proposed a tender offer for the shares of stock of Phillip A. Hunt Chemical Corporation (Hunt). Hunt's board of directors (the Hunt

---

nal affairs of the thousands of corporations and business entities conducting a vast amount of the world's commercial affairs. Delaware State Courts, http://courts.delaware.gov/chancery/ (last visited Jan. 27, 2013); *see also* Rick Geisenberger, *The Delaware Corporation Franchise Tax*, 30 Del. Law. 18, 19 (2012) ("[O]ur Court of Chancery is a unique, centuries-old business court that, along with the Delaware Supreme Court, has authored most of the modern U.S. corporate case law."); John F. Coyle, *Business Courts and Interstate Competition*, 53 Wm. & Mary L. Rev. 1915, 1915 (2012) (arguing that business courts do not serve to attract companies from other states because, *inter alia*, those courts are unlikely to successfully compete with the Delaware Chancery Court).

6. The line of cases cited in the trial court's order: *Baron v. Allied Artists Pictures Corp.*, 717 F.2d 105 (3rd Cir.1983); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F.Supp. 372 (D.Del.1983); *Kaufman v. Albin*, 447 A.2d 761 (Del.Ch.1982).

7. The line of cases relied on by the court of appeals in reversing the trial court's order: *Int'l Brotherhood of Teamsters v. Coca–Cola Co.*, 954 A.2d 910 (Del.2008); *Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del.Ch. 1993); *Brown v. Automated Mktg. Sys., Inc.*, No. 6715, 1982 WL 8782, at *1 (Del.Ch. Mar. 22, 1982).

Board) voted unanimously to recommend to all Hunt stockholders that they accept the offer and tender their shares to Turner. *Id.* at 762. However, the Hunt Board subsequently considered the ramifications of the proposed offer on certain unexercised stock options held by Hunt employees, including officers. *Id.* The Hunt Board decided to avoid certain profit charges by accelerating the option date of all options held by non-officer employees. *Id.* The Hunt Board allowed corporate officers the opportunity to cancel their options and receive the difference between the option price and the tender officer price. *Id.* The Hunt Board adopted these decisions by resolution on August 22, 1977. *Id.* However, the resolutions were contingent upon Turner's actual commencement of the tender offer. *Id.* The tender offer began on September 12, 1977, and was consummated on October 3, 1977. *Id.* The plaintiffs contended that the directors wasted corporate assets by permitting corporate officers to surrender their options in connection with the tender offer. *Id.*

A primary issue in *Kaufman* was the date the cause of action arose. The defendants argued that the action arose on August 22, 1977, the date the Hunt Board took action. *Id.* at 763. The plaintiffs countered that the wrong did not occur until October 3, 1977, the date the tender offer ended, and that until the tender offer's actual completion, no injury could have occurred. *Id.*

The trial court agreed with the plaintiffs, relying on precedent stating that when exchanges of stock are contingent upon shareholder approval, the transaction is not complete until the shareholder vote takes place. *Id.* at 764 (citing *Lavine v. Gulf Coast Leaseholds,* 122 A.2d 550 (Del.Ch.1956); Folk, *The Delaware General Corporation Law,* 487 (1967)). According to the trial court, the wrong "was a continuing wrong." *Id.*

In *Dofflemyer v. W.F. Hall Printing Company,* 558 F.Supp. 372 (D.Del.1983), the United States District Court for the District of Delaware analyzed the defendant's motion to dismiss a derivative action brought by Robert and Josephine Dofflemyer (the plaintiffs) against W.F. Hall Printing Company's board of directors (the defendants) in connection with a merger of W.F. Hall Printing Company and a second tier subsidiary of Mobil Corporation. *Id.* at 375. The plaintiffs

claimed that the defendants breached their fiduciary duty by engineering a merger that served no valid business purpose but benefited the majority shareholders' interests. *Id.* at 379. Allegedly, the defendants obtained an investment opinion from a banking firm they knew not to be independent, maneuvered to avoid provisions in the bylaws intended to protect minority shareholders, and issued a false and misleading proxy statement. *Id.*

The parties disputed when the statute of limitations began to run on the plaintiffs' claim. Relying on *Kaufman,* the district court held that the plaintiffs could not have sued for damages until the merger was "actually accomplished." *Id.* According to the court, until that time, the plaintiffs had suffered no injury as a result of the defendants' acts. *Id.*

Later that same year, the United States Court of Appeals for the Third Circuit issued its decision in *Baron v. Allied Artists Pictures Corporation,* 717 F.2d 105 (3rd Cir.1983). In that case, John Baron, a stockholder in Allied Artists Pictures Corporation (Allied Pictures), appealed a summary judgment decision dismissing his complaint as time-barred. *Id.* at 106. Baron sought damages and declaratory relief concerning a merger between Allied Pictures and Allied Industries consummated on January 20, 1976. Baron alleged that the proxy solicitations, dated November 24, 1975, were false and misleading. *Id.* Baron filed his complaint on January 19, 1979. *Id.*

The Delaware district court had consistently recognized the principle that the statute of limitations begins to run from the date of the injury caused by the defendant. *Id.* (citing *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 494 F.Supp. 1139, 1157 (D.Del.1980), *Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co.,* 484 F.Supp. 1375, 1388 (D.Del. 1980); *Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 922 (D.Del.1975)). Thus, the district court held that Barron's complaint fell outside of Delaware's three year statute of limitations. *Id.* at 107.

The Third Circuit reversed, relying on precedent recognizing the general principle that a cause of action for the recovery of damages accrues only when it could be prosecuted to a successful conclusion. *Id.* at 108 (citing *United States v.*

*Wurts*, 303 U.S. 414, 418, 58 S.Ct. 637, 82 L.Ed. 932 (1938); *Grayson v. Harris*, 279 U.S. 300, 304–05, 49 S.Ct. 306, 73 L.Ed. 700 (1929); *City of Philadelphia v. Lieberman*, 112 F.2d 424, 428 (3d Cir.1940)). The Third Circuit did not view Baron's injury as having taken place at the time of the actual breach:

> Had Baron filed his complaint seeking money damages caused by anticipated use of the proxies in consummation of the merger, that complaint would properly have been dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which money damages could be awarded. Until the plaintiff can allege facts which would survive such a motion, his cause of action for damages, personal or derivative, has not accrued. Until it has accrued the statute of limitations does not come into operation.

*Id.* at 109; *but see Brown v. Automated Mktg. Sys.*, No. 6715, 1982 WL 8782, at *2 (Del.Ch. Mar. 22, 1982) ("Nor can there be an argument that no wrong occurs until the merger is voted upon and approved. The transaction of which she complains is the act of Automated's board in passing a resolution approving the merger on terms which she feels to be unfair to the public shareholders."); *FMC Corp. v. R.P. Scherer Corp.*, 1982 WL 17888, at *2 (Del.Ch. Aug. 6, 1982) ("In this case, FMC wants to contest what the Directors ... approved and were submitting to the stockholders for approval. Why should FMC be heard to complain about what they bought? The Proxy Statement had been public for 16 days.").

In our view, prior to the Delaware Supreme Court's decision in *Van Gorkom*, there was a fractured view among Delaware courts regarding the point at which a claim for breach of fiduciary duty accrues.[8] Therefore, some of these decisions lend support to Petitioner's argument.

---

8. However, in *Brambles USA, Inc. v. Blocker*, 731 F.Supp. 643 (D.Del. 1990), the Delaware district court distinguished the tender offer of *Kaufman* from a fixed contract situation like that in the instant case:

> For similar reasons, Brambles' reliance on *Kaufman* is misplaced. In that case, until the requisite number of shareholders tendered pursuant to the tender offer there was no transaction. As the Court said, until that time the transaction complained of was subject to extinction. The resolutions of the board in *Kaufman* were simply not binding until it was consummated by the shareholders tendering the requisite number of shares into the tender offer. In the case *sub*

## B. The *Van Gorkom* decision

As discussed, *supra,* the Delaware Supreme Court's decision in *Technicolor* explained that tort principles do not belong in the analysis of a breach of fiduciary duty under Delaware law. *See Technicolor,* 634 A.2d at 370. We view the *Technicolor* decision as a natural extension of the Delaware Supreme Court's sweeping opinion in *Van Gorkom.*

In *Van Gorkom,* the shareholders of Trans Union Corporation (Trans Union) brought a class action seeking rescission of a cash-out merger of Trans Union into New T Company (New T), a wholly owned subsidiary of Marmon Group, Incorporated. 488 A.2d 858, 863.

In August 1980, Trans Union CEO Jerome Van Gorkom began discussions with Trans Union senior management to discuss the possibility of selling Trans Union due to the company's inability to generate sufficient income. *Id.* at 865. Van Gorkom decided to meet with Jay Pritzker, a corporate takeover specialist. *Id.* at 866. However, prior to the meeting, and without consulting with Trans Union's board of directors (the Trans Union Board), Van Gorkom calculated, along with the CFO, an estimated price for Trans Union at $55 per share. *Id.* On September 13, 1980, Van Gorkom met with Pritzker and presented a plan for Pritzker to purchase Trans Union at $55 per share and "pay off most of the loan in the first five years." *Id.* Pritzker expressed interest in Van Gorkom's offer, and the two began a series of secret meetings on September 17 and 18. *Id.* at 867. Pritzker and Van Gorkom agreed that a merger would occur, and that the Trans Union Board needed to act on the merger proposal no later than September 21. *Id.* On September 19, Van Gorkom consulted with Trans Union's bank regarding financing and retained an outside attorney, instead of Trans Union's legal

---

*judice,* the merger in May, 1988, fixed the method of payment. That it may have provided an alternative method of payment does not mean that the Exchange/Put Agreement and the Merger Agreement were not binding on the parties. Thus it was not a resolution as in *Kaufman;* rather, it was a fixed contract.

*Id.* at 650 (internal citations omitted). Thus, the *Brambles* and FMC Corp. decisions support a plausible view that Delaware courts have consistently held that a breach of fiduciary duty claim accrues at the time a merger's terms are fixed, and that a tender offer, like that in *Kaufman,* is a distinct situation for accrual analysis purposes.

staff, to advise him on the merger. *Id.* On that same day, Van Gorkom called a special meeting of the Trans Union Board for September 20. *Id.* On September 20, Van Gorkom provided the Trans Union Board with a thirty-minute presentation on the merger. *Id.* at 868. The meeting lasted approximately two hours, and based solely on Van Gorkom's short oral presentation, the Trans Union Board approved the merger. *Id.* at 869. On September 22, Trans Union issued a press release announcing the definitive agreement. *Id.* On December 19, a shareholder commenced class action litigation. *Id.* at 870. On February 10, Trans Union stockholders approved the merger. *Id.*

The trial court found that the Trans Union Board's conduct was not reckless or improvident, but informed. *Id.* at 871. The trial court held that the Trans Union Board was free to turn down Pritzker's offer, and that the parties did not reach a legally binding offer until after the Trans Union Board had been informed of the merger terms. *Id.* However, the plaintiffs maintained on appeal that the initial decision to accept the $55 per share offer was not informed. *Id.* The Delaware Supreme Court agreed.

The Delaware Supreme Court found that the Trans Union Board's decision to sell the company to Pritzker was not an informed business judgment:

> The directors (1) did not adequately inform themselves as to Van Gorkom's role in forcing the "sale" of the Company and in establishing the per share purchase price; (2) were uninformed as to the intrinsic value of the Company; and (3) given these circumstances, at a minimum, were grossly negligent in approving the "sale" of the Company upon two hours' consideration, without prior notice, and without the exigency of a crisis or emergency.

*Id.* at 874. Thus, the court concluded that the Trans Union Board was grossly negligent in failing to act with informed reasonable deliberation in agreeing to the merger proposal on September 20. *Id.* at 882, 893 ("We hold, therefore, that the Trial Court committed reversible error in applying the business judgment rule in favor of the director defendants in this case."). Additionally, the court held that the Trans Union

Board could be held liable for the fair value of the plaintiffs' shares on September 20. *Id.* at 893.

The *Van Gorkom* decision caused widespread angst about the personal culpability of corporate directors. *See* Sale, 89 Cornell L. Rev. at 466. The Delaware General Assembly swiftly amended the Delaware General Corporation Law to allow for an optional charter provision to exculpate directors for violating the duty of care. *Id.* This charter provision may only be proposed by directors and once approved by shareholders, may only be removed by directors. *Id.* In addition, several judicial decisions have chipped away at *Van Gorkom's* breadth. *See, e.g., Gantler,* 965 A.2d at 713 n. 54 (holding that scope of the common law shareholder ratification doctrine encompasses only those director actions that do not legally require shareholder approval and overruling *Van Gorkom* to the extent it held otherwise); *Emerald Partners,* 787 A.2d at 90 ("The purpose of Section 102(b)(7) was to *permit shareholders* ... to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct." (emphasis in original)).

Nevertheless, an essential point from *Van Gorkom* remains good law: A corporate board violates its fiduciary duty when it approves a merger or other corporate act inconsistent with the duty of care, loyalty, or good faith, and this act gives rise to a cause of action regardless of later shareholder approval. Delaware cases following *Van Gorkom* illustrate this principle.

## C. Post-*Van Gorkom*

In *Dieter v. Prime Computer,* 681 A.2d 1068 (Del.Ch.1996), Prime Computer, Incorporated (Prime) was a Delaware corporation with its offices in Massachusetts. D.R. Holdings, Incorporated (Holdings), a Delaware corporation, formed two wholly owned subsidiaries: Acquisition and DR Merger, Inc. (DR Merger), to acquire Prime. *Id.* at 1069. On June 23, 1989, the Prime board of directors (the Prime Board) approved a merger between Prime and Acquisition and DR Merger. *Id.* at 1070. The Prime Board announced the merger agreement on August 4, 1989. The plaintiffs, Prime shareholders, challenged the merger's terms and filed a motion for class certifi-

cation against Prime, Acquisition, and DR Merger (collectively, the defendants). *Id.* at 1072. The defendants challenged the plaintiffs as appropriate representatives of the class and asserted that the plaintiffs failed the "typicality" requirement. *Id.* The defendants argued that the plaintiffs did not have a claim typical to other class members because "they purchased all of their shares of Prime stock between October 23, 1989 and December 12, 1989," well after the Prime Board announced the merger on August 4, 1989. *Id.*

The trial court agreed:

The challenged transaction is [the Prime Board's] approval of the [m]erger. The alleged breach of fiduciary duty occurred at the time the [the Prime Board] approved the [m]erger [a]greement—June 23, 1989. It is not the [m]erger that constitutes the wrongful act of which [the plaintiffs] complain; it is the "fixing of the terms of the transaction." [The plaintiffs] will be subject to a defense that there is no continuing wrong. Arguably, [the defendants] refusal to cancel the [m]erger was not the wrongful act producing allegations of breach of fiduciary duty; it was the original decision to effectuate the [m]erger.

*Id.* (internal citations omitted).[9]

In *Seidel v. Lee*, 954 F.Supp. 810 (D.Del.1996), the Delaware district court analyzed whether a plaintiff's state law claims in a securities based lawsuit were time-barred. In that case, the district court held that publicly filed documents give adequate notice of possible wrong-doing, sufficient to support a claim:

However, beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings. Here, the Court concludes that the public documents, which form the basis of many of Plaintiff's claims, could have

---

**9.** *See also Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del.Ch.1993) ("The wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in contract actions.").

provided Plaintiff with adequate notice of any alleged misconduct by Defendants.

*Id.* at 817 (holding the doctrine of inherent unknowability inapplicable to the plaintiff's case and barring the plaintiff's state law claims).

In *Albert v. Alex. Brown Management Services,* No. Civ.A. 762–N, 2005 WL 1594085, at *1 (Del.Ch. June 29, 2005), the plaintiffs, investors in two exchange funds, sued the funds' managers for breach of fiduciary duty. *Id.* at * 1. Each plaintiff contributed appreciated securities to the funds in the hopes of receiving a diversified basket of securities, capital appreciation, and tax deferral. *Id.* After the funds' value collapsed, the funds' managers suspended redemptions and communications with the investors. *Id.* The plaintiffs sued, and the managers sought to dismiss both complaints, arguing, *inter alia,* that the plaintiffs' claims were time-barred. *Id.*

The plaintiffs argued that their claims did not accrue until after the allegedly wrongful acts, specifically, when the funds' net asset value sank below the level the manager's initially reported. *Id.* at *18. The plaintiffs asserted that they could not have suffered an injury or damages before suffering a loss relative to their initial investment. *Id.* The court rejected the plaintiffs' claim:

> This is incorrect. The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs. This is so because the plaintiffs were harmed as soon as the alleged wrongful acts occurred. Whether or not the plaintiffs could have sued for damages *is not dispositive* as to whether the claim accrued, since, as soon as the alleged wrongful act occurred, the plaintiffs could have sought *injunctive relief.* They did not. Instead, they waited until the value of the [f]unds climbed to dizzying heights, and then came crashing down.

*Id.* (emphasis added). The court also described the strong policy considerations behind this view of claim accrual:

> The flaw in the plaintiffs' argument is best exemplified by their claims for hedging. The wrongful act the plaintiffs allege is the unhedging of the funds. However, after the defendants unhedged the funds, their value skyrocketed. This was due, of course, to the fact that the funds were

exposed to much more risk. Assuming (without deciding) that unhedging the funds was a wrongful act, it was wrongful because it exposed the funds to this extra risk. However, under the plaintiffs' theory, they are given the equivalent of a call option. If the unhedging of the funds works out, and the value of the funds goes up, the plaintiffs will have no complaint. But if the hedging (or lack thereof) strategy does not work out, and the value of the funds falls, the plaintiffs can sue. This clearly is not, and should not be, the law. The plaintiffs made the decision to ride the bubble to the top. They cannot now complain that the bubble burst. The court reiterates that a claim accrues at the time of the alleged wrongdoing, and not when the plaintiff suffered a loss.

*Id.*

The *In re SunGard Data Systems, Inc. Shareholders Litigation,* No. Civ.A. 1221–N, 2005 WL 1653975, at *1 (Del.Ch. July 8, 2005), decision is an example of a suit actually *commenced* under the post-*Van Gorkom* accrual principle. In that case, shareholders of SunGard Data Systems, Incorporated (SunGard) filed a class action suit claiming breach of fiduciary duty in the proposed merger of the company with Solar Capital Corporation (Solar). *Id.* at *1. Following approval of the merger, SunGard's shareholders were to receive $36 per share, a 44.4% premium over the share's prior market price. *Id.* The plaintiffs claimed that the defendants breached their fiduciary duties by agreeing to an unfair price and that the defendants failed to provide adequate disclosure of the proposed merger. *Id.* The plaintiffs sought an order expediting proceedings for the purpose of presenting a motion for a preliminary injunction. *Id.* The court denied the motion and ruled the plaintiffs failed to present a colorable claim. *Id.* at *1–2 ("The Proxy Statement devotes over 15 pages to a description of the investment bankers' analyses . . . [T]his information is public and readily available to the shareholders. Viewed in relation to the 'total mix' of available disclosure, this claim does not give rise to a colorable claim of breach of the duty of disclosure."). The *SunGard* decision is a practical application of the post-*Van Gorkom* rule indicating that Delaware courts expect claims for breach of fiduciary duty to be brought at the time the alleged breach occurs, and that the

viability of those claims will be evaluated with reference to disclosures made when a merger is proposed and accepted.

Finally, the Delaware Supreme Court appears to have given a sign of approval of the post-*Van Gorkom* approach to claim accrual in its review of *In re Coca–Cola Enterprises, Inc. Shareholders Litigation,* C.A. No.1927–CC, 2007 WL 3122370, at *1 (Del.Ch. Oct. 17, 2007). *See Int'l Brotherhood of Teamsters v. Coca–Cola Co.,* No. 601, 2008 WL 2484587, at *1 (Del. June 20, 2008) ("This 20th day of June 2008, upon consideration of the briefs of the parties, and their contentions in oral argument, it appears to the Court that the judgment of the Court of Chancery should be affirmed on the basis of and for the reasons set forth in its decision dated October 17, 2007.").[10]

In that case, the International Brotherhood of Teamsters (the Teamsters) filed a derivative action against Coca–Cola (Coke) alleging breaches of fiduciary duty. *Coca–Cola,* 2007 WL 3122370, at *1. Nominal defendant, Coca–Cola Enterprises (CCE), was the largest bottler and distributor of Coke beverage products in the world. *Id.* Initially formed as a wholly owned subsidiary of Coke, CCE was spun off in 1986 as an independent, public company. *Id.* Its relationship with former parent Coke continued pursuant to a series of contracts and licensing agreements. *Id.* The most important of those contracts was the 1986 Master Bottle Contract (the 1986 MBC). *Id.* The 1986 MBC defined the contours of the relationship between CCE and Coke, and the plaintiffs alleged that Coke and CCE's directors worked together to abuse the relationship between the two companies. *Id.* at *2. The Teamsters filed suit on February 7, 2006. *Id.* at *1–2. Coke argued that regardless of any actions taken in the years immediately preceding the lawsuit, all of the Teamsters' claims arose from the 1986 MBC. *Id.* at *2. Thus, Delaware's three year statute of limitations barred the Teamsters' complaint. *Id.* at *4 ("Where, as here, a plaintiff seeks money damages for breach of fiduciary duties, the claim will 'be subject to the three-year limitations period of 10 *Del. C.* § 8106' and this Court need not 'engage in traditional laches analysis.'" (citations omitted)). The trial court agreed, and

---

10. *Int'l Brotherhood of Teamsters v. Coca–Cola Co.,* 954 A.2d 910 (Table) (Del.2008).

held that under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act—not when the harmful effects of the act are felt—even if the plaintiff is unaware of the wrong. *Id.* at *5, 7 ("CCE's relationship with Coke may not be optimal, but it is guided by a contract formed in 1986.").[11]

■ In our view, post-*Van Gorkom* decisions stand for the proposition that, under Delaware law, a shareholder's claim for breach of fiduciary duty accrues at the time corporate directors or officers breach their fiduciary duty. In the merger context, this includes a board of directors fixing merger terms inconsistent with their fiduciary role. The leading treatise on Delaware corporation law reflects this view:

> Generally, the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt. Therefore, the circumstances of the case will determine whether the transaction is executed or continuing. For instance, an offer made by the corporation to certain of its stockholders to exchange one class of stock for another, which was specifically conditioned on approval by the corporation's other stockholders, was held to not be completed until stockholder approval was obtained. ***On the other hand, both a proposed merger and a proposed supermajority voting provision have been held to be consummat-***

---

11. The trial court in the instant case cited *Coca-Cola* in support of its finding in favor of Petitioner:

> As recently re-affirmed by the Delaware Supreme Court, there can be no breach of fiduciary duty claim regarding an underlying contract until the contract is legally enforceable. Accordingly, since FITG had no right to enforce the merger until the closing date, plaintiff's claims for breach of fiduciary duty did not accrue until that date.

However, the court of appeals adequately addressed the trial court's misapprehension of *Coca-Cola's* "legally enforceable" language:

> Finally, we do not believe the "legally enforceable rights" language in *Kahn* and *Coca-Cola* necessitate[s] a finding that [Petitioner's] claim accrued after the merger. Once the merger agreement was signed, SCI and FITG had legally enforceable rights against each other to proceed with all aspects of the merger agreement in good faith. If they did not, they would be in breach of the agreement and subject to suit. More importantly, once the merger agreement was signed, [Petitioner], as a shareholder, had a legally enforceable right to enjoin the merger.

*Menezes,* 392 S.C. at 596, 709 S.E.2d at 121 (alterations added).

*ed when their terms were fixed and announced by the board of directors, and not to be continuing transaction up to the time of stockholder approval.*

2 Edward P. Welch, *Folk on the Delaware General Corporation Law: Fundamentals* § 327.3.2 (2010) (emphasis added);[12] *see also Wacht v. Cont'l Hosts, Ltd.,* Civ. A. No. 7954, 1993 WL 315461, at *2–3 (Del.Ch. Aug. 5, 1993) (finding that a shareholder could have challenged a proposed merger at the time of the merger's announcement).

### III. Petitioner's Claim

■ Petitioner argues that the court of appeals erred in holding that his claim for breach of fiduciary duty accrued when the SCI Board voted to approve the merger, and not when the merger was formally consummated by a shareholder vote. We disagree, and find that the trial court erred in relying on pre-*Van Gorkom* authority. The court of appeals properly reversed in light of the current state of Delaware law regarding accrual of a claim for breach of fiduciary duty.

■ Petitioner attempts to distinguish post-*Van Gorkom* case law, and argues, for example, that cases such as *Dieter v. Prime Computer,*[13] and *FMC Corporation v. R.P. Scherer Corporation,*[14] are inapplicable because those cases address a shareholder's standing to bring a claim for breach of fiduciary duty. This distinction is of no moment. In order to have standing one must generally have a personal stake in the subject matter of the lawsuit, i.e., one must be a *real party in interest.* *Glaze v. Grooms,* 324 S.C. 249, 255, 478 S.E.2d 841, 845 (1996); *see, e.g., Appriva S'holder Litig. Co. v. EV3, Inc.,*

---

12. *Kaufman v. Albin, supra,* relied on an older version of this treatise:

> Accordingly, the circumstances of the case will determine whether the transaction is executed or continuing. If the action complained of requires stockholder approval, the transaction is not considered complete until the stockholders have approved it.

*Kaufman,* 447 A.2d at 764 (citing Folk, The Delaware General Corporation Law, 487 (1967)). The revision to the Folk treatise demonstrates the Delaware court's evolution on the accrual of a claim for breach of fiduciary duty, and the inapplicability of the *Kaufman* decision to the instant case.

13. 681 A.2d 1068 (Del.Ch.1996).

14. No. 6889, 1982 WL 17888, at *1 (Del.Ch. Aug. 6, 1982).

937 A.2d 1275, 1293 (Del.2007) ("In both actions, the defendants contend that the plaintiffs are not the real parties in interest. '[A] real party in interest objection closely resembles the defense of failure to state a claim for relief because it presupposes that the plaintiff does not have the substantive right [standing] to enforce the claim he is making.'" (alterations in original)) (citing 6A Wright, Miller & Kane, Federal Practice and Procedure § 1554 (3d 2004)).

A determination of when a claim accrues is essential in deciding whether a person has a viable stake in the subject matter of a lawsuit. Therefore, deciding the question of claim accrual through a standing analysis only increases the relevance of these opinions. Additionally, decisions addressing the standing issue are only a portion of the cases cutting against Petitioner's claim.

Petitioner also accuses the court of appeals of ignoring *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 (Del.Ch.2006), which allegedly makes "clear" that Petitioner's cause of action for breach of fiduciary duty could not have occurred prior to the closing of the merger. However, in our view, if the court of appeals "ignored" *Aidinoff*, it is because the case is inapposite.

In *Aidinoff*, the plaintiff, Teacher's Retirement System of Louisiana (Teachers), sought relief on behalf of nominal defendant American International Group (AIG), against three AIG executives, Maurice Greenberg, Edward Matthews, and Howard Smith, and a separate corporation, Starr & Company, Incorporated (Starr) (collectively, the defendants). *Aidinoff*, 900 A.2d at 658. Starr operated four general insurance agencies and secured substantial payments from reinsurers dealing with AIG. *Id.* Greenberg, Matthews, and Smith were Starr's top three shareholders. *Id.* Greenberg served as Starr CEO, and Matthews and Smith served as directors. *Id.* Teachers claimed that Starr did not perform any duties that AIG could not perform in-house, and that the corporation existed merely as a vehicle to enrich Greenberg, Matthews, and Smith. *Id.*

Teachers alleged that this sham contractual relationship existed for at least twenty years before the period challenged in their complaint—1999 to 2004. *Id.* Teachers also com-

plained that AIG annually decided to continue the practice. *Id.* at 658–59. The defendants argued, *inter alia*, that Teachers' claims were time-barred. *Id.* at 659. The court disagreed, and held that although the contractual relationship originated far outside the statute of limitations, AIG had no contractual duty to place business through Starr and had an annual opportunity to terminate Starr's contracts:

> Therefore, the complaint is not challenging the original decision of AIG to sign the [agreements] in the 1970s. It is attacking the allegedly disloyal and self-enriching decision of Greenberg, Matthews, and Smith to perpetuate an unfair relationship with Starr, with the supine complicity of the outside directors of AIG, who breached their duty of care by failing to understand, much less knowingly approve, the Starr—AIG relationship.

*Id.* at 659, 666. Curiously, Petitioner cites this very paragraph in support of his position. However, unlike the plaintiff in *Aidinoff*, Petitioner challenges an original decision, that of the SCI Board to adopt the terms of the merger with FITG. Petitioner does not challenge later, separate acts, such as the propriety of the shareholder vote approving the merger. Thus, *Aidinoff's* holding does not support Petitioner's view of claim accrual, and its focus on the possible continuing wrong of contract renewal is immaterial to the instant case.

The most recent Delaware authority does not comport with the notion that a plaintiff must wait for actual damages prior to filing an action for breach of fiduciary duty, and there are important public policy justifications for this trend. For one, the actions of corporate directors and officers are given deference through application of the business judgment rule, but this deference evaporates when the directors and officers fail to abide by the duties of care, loyalty, or good faith. Second, forcing a plaintiff to wait for actual damages translates into requiring a company and its shareholders to undergo possibly significant harm instead of taking action to prevent that harm. Efficiency and opportunity costs disfavor this approach. Finally, requiring a showing of actual damages for a breach of fiduciary duty allows individuals to purchase a lawsuit after a merger's terms have been fixed and publicly announced. This type of litigation has been expressly rejected by Delaware courts.

CONCLUSION

 The foregoing analysis of Delaware law makes clear that a claim for breach of fiduciary duty accrues at the time of the breach, and that a plaintiff need not show damages in order to bring her claim. In the merger context, this breach takes place when the directors fix or adopt the terms of a merger contract. The facts of the instant case demonstrate that any alleged breach occurred when the SCI Board adopted and publicly announced the terms of the merger with FITG. Following the SCI Board's adoption and announcement of the merger terms, but prior to the merger's completion, Petitioner released all claims he held against SCI.[15] Therefore, we acknowledge the court of appeals' well-reasoned analysis, but disagree that Petitioner's claim merely "could" have arisen prior to the closing of the merger. Instead, we find that Petitioner held a valid claim at the time he signed the Release, and therefore, his suit cannot be sustained and is dismissed with prejudice. The court of appeals correctly held that trial court erred in dismissing Respondents' defenses and counterclaim relating to the Release.

---

**15.** The court of appeals' decision contains a separate concurrence addressing the trial court's combination of Petitioner's ten claims for breach of fiduciary duty. *Menezes,* 392 S.C. at 597–98, 709 S.E.2d at 121–22. The concurrence states that on remand, the trial court should divide Petitioner's claim because "one or more acts could be deemed a separate breach of fiduciary duty based on when each act occurred." *Id.* at 598, 709 S.E.2d at 122. We disagree.

Procedurally, any objection to the trial court's consolidation of Petitioner's allegation is not preserved for review. *Id.* at 598, 709 S.E.2d at 121. Additionally, it is not even clear that Petitioner contests the consolidation. *Id.* ("Appellants neither argued that the claims should be considered separately, nor asked the court to alter or amend its ruling on the issue.").

According to the concurrence, any claims arising between Petitioner's signing of the Release on September 28, 2006 and the finalizing of the merger on October 20, 2006, are valid. The concurrence is theoretically correct. If Petitioner released all claims on September 28, 2006, any *separate* breaches of fiduciary duty that occurred after that point would not be covered by the release. However, Petitioner's ten allegations are all consanguine with the SCI Board's adoption of the merger terms. Each of the ten allegations stems from the SCI Board's fixing the merger terms, which occurred prior to the date Petitioner released all claims against SCI. Thus, the trial court properly consolidated Petitioner's allegations, and the parties to this action acquiesced in that decision.

Thus, we remand for proceedings consistent with this opinion. The court of appeals' decision is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in result only.